**IN RE David Richard DAVIES, Debtor.**

**Case No. 15–01578–TLM**

United States Bankruptcy Court,
D. Idaho.

Signed October 26, 2017

William Jake O'Connor, O'Connor Law, PLLC, Hyrum M. Zeyer, Peterson Zeyer Law, Boise, ID, for Debtor.

## MEMORANDUM OF DECISION

TERRY L. MYERS, CHIEF U. S. BANKRUPTCY JUDGE

### PROCEDURAL BACKGROUND

The chapter 7 debtor, David Davies ("Davies"), filed his petition on November 30, 2015.[1] Davies received a discharge on March 14, 2016, and the case was closed as a no asset case on April 7, 2016.

On January 27, 2017, Davies filed a state court complaint against Carmen Becker ("Becker"), a woman with whom he had been in an extended relationship. Becker filed an answer and asserted several counterclaims. Subsequently, on August 1, 2017, Davies reopened his bankruptcy case and filed a motion in this Court seeking imposition of contempt sanctions against Becker for violation of his discharge injunction based on her assertion of those counterclaims. Doc. No. 43 ("Motion").[2]

This matter was heard on September 5 and 7, 2017, at which time Davies and Becker, each represented by counsel, appeared and presented evidence and argument.[3] The Motion was taken under advisement. This decision resolves the same and constitutes the Court's findings of fact and conclusions of law.

### FACTS

Davies and Becker commenced their relationship in 2010, ultimately living together though they never married.

They together purchased a house in January 2012, with Davies putting $70,000 down and incurring a loan for the balance of the purchase price. Title was held solely in Davies' name. However, Becker agreed to pay Davies funds which would service the debt on the house and, in her view,

---

1. Unless otherwise indicated, statutory references are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532, and rule references are to the Federal Rules of Bankruptcy Procedure.

2. Parties who violate the discharge injunction may be liable under a theory of contempt, which is an exclusive remedy because debtors have no "private right of action" for damages. *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 510 (9th Cir. 2002). Generally speaking, civil contempt sanctions for violation of the discharge injunction must be sought by motion rather than through an adversary proceeding. *Barrientos v. Wells Fargo Bank, N.A.*, 633 F.3d 1186, 1190–91 (9th Cir. 2011); *see also* Fed. R. Bankr. P. 9020.

3. *See* Doc. Nos. 52, 54 (minute entries). Davies and Becker were the only witnesses.

develop "equity" in the property. The parties treated the house as jointly owned, and kept a ledger of Becker's payments toward the house debt, which they called "rent," and the parties' other household payments and expenses. Ex. 120.

When Davies filed his case in 2015, he claimed the house as his asset alone.[4] He disclosed no co-owner, nor did he complete schedule A's required disclosure of "nature of debtor's interest in property." Davies' bankruptcy counsel requested that he obtain a written statement from Becker to the effect that she lived with him, paid "rent" and contributed to the household expenses, and she executed such a statement. Ex. 100.[5]

In June 2013, Davies and Becker had a son.[6] In 2014, though, Davies and Becker were having difficulties and had even started couples' therapy. That summer, there were email discussions of the possibility of Becker moving out and about how the parties might settle their intermingled financial affairs. Ex. 119. In these discussions Davies indicated that Becker's "rent" was used to make payments on the first mortgage loan and, thus, was building "equity." Id.[7] He also indicated that if she

were to stay, and when the first mortgage was paid, he would retitle the house showing them as co-owners. Id.

By late 2014, however, things had deteriorated. Part of the pressures resulted from ongoing litigation between Davies and an ex-wife over support and other issues.[8] In emails, Becker asked "How would you like to pay the equity in I [sic] house, that belongs to me." Davies replied, "It [sic] yours if you want it. I can pay you tonight." Becker stated "Ok. Thanks." Davies then wrote, "Attached is the current standing on the loan. I believe I owe you $11,054.99." He then stated, "I will pay you once everything is settled and you have moved out." Ex. 201.[9]

Davies testified he paid Becker $10,000 in December 2014, taking the funds out of the HELOC. Becker indicated that $10,000 was the maximum amount Davies could draw on his line of credit. This payment left approximately $1,055 owed to Becker according to Davies' calculation.

However Davies later asserted that this was not a payment of accrued equity but, rather, a $10,000.00 "loan" to Becker. He claimed that, under their loan "agree-

---

4. In his schedules, Davies claimed the house was worth $168,800.00 at filing with secured claims of $83,474.36 against it. The secured claims are shown as being owed to Idaho Central Credit Union with a "first mortgage" incurred on January 27, 2012, in the amount of $55,092.00 at filing, and a "second mortgage" incurred on March 1, 2013, in the amount of $28,382.36. Ex. 200 at sched. A and D.

5. Her letter is dated April 7, 2015. Davies contemplated filing for bankruptcy relief as early as the spring of 2015, and thus obtained such a letter. As noted, he did not ultimately file until November 30, 2015.

6. Though Davies' schedule J indicates another child also lived with him, the parties' children from prior relationships, and where they lived, are not critical to this Decision.

7. He also acknowledged that the second mortgage was a HELOC that he had taken out to pay his legal bills involving litigation with his ex-wife and that this was his sole and separate liability. Id.

8. See, e.g., Davies v. Davies, 160 Idaho 74, 368 P.3d 1017 (Idaho Ct. App. 2016) (addressing Davies' 2011 divorce from ex-wife Susan Davies, and affirming awards to her in 2013 and 2014 of attorneys' fees totaling $29,500.00, and affirming orders in her favor modifying child support obligations).

9. There are emails in the Ex. 201 chain both preceding and following the excerpts quoted. The emails do not show any attachment regarding Davies' calculation.

ment," Becker was to start repaying the loan once she gained employment.[10] Davies would a year later in his bankruptcy schedule B list the $10,000.00 as a "personal loan" owed to him by Becker under the category of "accounts receivable." Ex. 200 at 10.

Things between Davies and Becker steadily worsened.[11]

Davies was scheduled to take a week-long trip to Mexico on October 14, 2015. At the last minute he asked Becker to accompany him, but she declined. While Davies was in Mexico, Becker moved out of the house, taking what she deemed to be her property and personal effects. She had family members assist her, and some of the items were placed into storage areas. She testified she could not be absolutely certain whether or not any of Davies' personal property might have mistakenly been included.

Davies returned from Mexico and took the position that some of his property was either "stolen" or "destroyed." Under cross-examination Davies acknowledged that he filed an October 27, 2015 police report alleging such theft and destruction. The final disposition of that report was not made clear. Davies later contacted a supervisor at the Idaho National Guard where Becker's brother was employed, to raise issues about these events and the brother's involvement. Becker found this

action to be an extremely distressing form of attempted coercion of her in the ongoing disputes between her and Davies.[12]

Even though the parties continued to have email communications about how to resolve their disputes, financial and otherwise, things continued to deteriorate. It reached a peak in early November 2015, when Davies sent an email to Becker with the terse message: "The next move is yours—escalate or cooperatively work together? I am ready for either." Ex. 206.[13] The following day, he sent a text message that severely shook Becker. It contained only a photo of their child under which were the words: "Escalate or cooperate?" Ex. 207.

As noted, Davies later that month filed his chapter 7 petition. While he indicated that Becker owed a $10,000.00 debt to him on his schedule B, he did not list Becker as a creditor, despite at various times acknowledging he owed her for her contributions toward payment of the first mortgage and other real property related expenses. And his schedule F did not reflect Becker's claim, whether he agreed with it or not, that he owed her at least $1,055 more. *See* Ex. 200.[14]

While asserting in schedule B that Becker owed him $10,000.00, Davies did not disclose on that schedule any of his other claims against her arising from the alleged October 2015 "theft" and "destruction" of

**10.** The evidence reflects no written document memorializing any loan or its terms.

**11.** As with certain other aspects of their domestic discord, the details are not directly relevant to the resolution of the Motion. They have been carefully considered, however, in assessing credibility and determining the weight to be given the parties' testimony.

**12.** Testimony indicated this contact occurred in August 2016. Davies admitted he had included the brother's name in his police report in October 2015. The timing of his contact of

Becker's brother's superiors nine months later validates Becker's interpretation.

**13.** This email suggests, but the exhibit does not include, an attachment about "missing items" that apparently refers to those allegedly taken when Becker moved out over a year earlier.

**14.** The schedules allow debtors to disclose claims made against them even though the same are contingent, unliquidated or disputed.

personal property, which he had asserted in a police report a little over a month earlier.[15]

On March 14, 2016, Davies received his discharge. On that very same date, he sent Becker an email captioned "1099" in which stated: "see attached for your taxes. The IRS has been notified." Ex. 204. Attached to the email was a Form 1099–MISC showing that Becker had been the recipient of $10,000 in "other income." Ex. 205. When Becker responded that, "Well then distribution in full of all my equity interest in the house will need to be paid[,]" Davies replied: "The $10,000 was a loan not paid back so it counts as income for you according to my tax advisor." *Id.* The emails that day continued. Ex. 115. Davies continued to press the idea that the money was a loan, not a repayment or reimbursement of equity, and he used the letter Becker earlier signed for Davies' bankruptcy counsel, at Davies' insistence, about Becker paying "rent" in an attempt to counter her arguments about equity. The parties also continued to blend these disputes into those about custody and care of their child and other disagreements.

About a month later, on April 7, 2016, Davies' chapter 7 was closed as a no-asset case.

As noted, Becker had never been scheduled or listed by Davies as a creditor. She was not served by the Court with any notice of the bankruptcy, *see* Doc. Nos. 2, 12 (notice of filing and certificate of service) nor served with notice of entry of discharge, *see* Doc. Nos. 25, 26 (discharge and certificate of service). Davies did not establish that he gave her notice independently.

Becker admitted having known Davies was contemplating a bankruptcy filing for quite some time, largely due to Davies' litigation with his ex-wife. She said that Davies provided several different reasons over time to explain why he had not filed.

The evidence is unclear as to precisely when Becker became aware that a bankruptcy had actually been filed. She did acknowledge having been shown a draft intake questionnaire sheet dated October 7, 2015 that Davies had prepared for a law firm. Ex. 203.[16] But in this form, Davies had answered "No" to the question "Does anyone owe you money for any reason?" *Id.* at 3.

In March 14, 2016 emails, Davies mentioned that the early 2015 letter Becker signed had been filed with the Court. Ex. 115. In reply, Becker stated "Dave, I have no clue what you filed with bankruptcy court or what you said or didn't say I paid or didn't pay. You never divulged that to me, nor was I party to the bankruptcy." *Id.* Thus, the emails and the testimony as a whole indicate Becker was aware of an actual bankruptcy filing by Davies at or about the time of these March 2016 emails.

## A. The State Court Action

On January 27, 2017, Davies commenced suit against Becker in the Third Judicial District Court for the State of Idaho, Canyon County. Ex. 101 (Complaint and Demand for Jury Trial in *Davies v. Becker*, Case No. CV–17–970) (the "State Court Action"). In it, Davies alleged Becker was

---

15. Davies also did not disclose any theft or other losses within the year preceding bankruptcy on his statement of financial affairs. Ex. 200 at 31.

16. This was a different law firm from the one Davies actually retained for the filing. The firm representing Davies in the filing was the same one that had requested and received Becker's April 2015 letter regarding "rent." Why Davies filled out this form for the other law firm shortly before filing with his initial attorney was not cogently explained.

obligated on a theory of breach of contract to repay the $10,000.00 and, in a later count, for an additional $550.00 in unpaid shared expenses, plus $629.16 on a cell phone bill. He also asserted counts in "trover for conversion of chattel" (regarding an unreturned engagement ring, and for the taking and destruction of unspecified property while Davies was in Mexico), and for conversion and unjust enrichment regarding a BMW.[17]

On February 8, 2017, Becker's counsel sent a letter to Davies' counsel, responding to the various allegations and demanding that, unless the suit was promptly dismissed, Becker would respond with an answer and a counterclaim. Ex. 102. When that did not happen, the Answer and Counterclaim was filed. Ex. 111.[18] In it, Becker made counterclaims for breach of contract (*i.e.*, for her interest in the property, including a claim for the shortfall of $1,055 after receipt of the $10,000.00 "equity" plus claims for reimbursement of her contributions toward the property's taxes, insurance and improvements), and claims for intentional and negligent infliction of emotional distress.

The bitter adversarial conduct of that litigation need not be examined at length. The salient point is that, at some point, Davies' counsel began arguing that Becker's counterclaims were barred by the bankruptcy discharge. Becker's counsel responded by letter on July 13 arguing that Davies failed to list Becker in his bankruptcy as a potential creditor and that failure "excepts Ms. Becker's claim from discharge." Ex. 108.[19] A subsequent July 21 letter from Davies' counsel referenced Ninth Circuit case law establishing that, notwithstanding the wording of § 523(a)(3)(A), a discharge in a no-asset chapter 7 case is effective against alleged creditors that were not listed in the bankruptcy petition. Ex. 109. The parties agree that Becker then offered to amend the counterclaim to eliminate any claims allegedly arising prior to the November 30, 2015 bankruptcy petition date, but insisted she could and would continue to defend the complaint's "loan" contentions and press all other counterclaims, including the emotional distress claims, that arose from Davies' acts after that date. This was not acceptable to Davies, who insisted amendment was not appropriate or sufficient, and that the counterclaims must be dismissed in toto. Things came to a head with the filing of the instant Motion for contempt.

## ANALYSIS AND DISPOSITION

### A. Davies' discharge injunction applies to Becker's attempted collection on her prepetition claims

Resolving Davies' Motion seeking contempt sanctions starts with determining the extent and effect of a discharge. Sec-

---

17. The BMW issue, and also allegations about a trailer taken by Becker, were also parts of the Davies' claims of theft or loss. However, none of these claims against Becker were listed as assets on his schedule B, nor were they identified on his statement of financial affairs.

18. The date of filing of this pleading is not clear, but it reflects service on Davies' state court counsel on February 22, 2017. *Id.*

19. Exhibit 104 is a copy of a PACER docket for Davies' case produced by Becker's counsel during discovery in the State Court Action. It bears a notation indicating it was downloaded on December 23, 2016. The evidence at hearing did not establish with certainty who downloaded the document. However Becker's counsel, in an affidavit filed prior to hearing, acknowledged reviewing the bankruptcy filing before the counterclaim was filed. Doc. No. 50-2 at 2. He stated that his actions were not taken in intentional disregard of the consequences of a bankruptcy discharge but, rather, were done in connection with and reliance on § 523(a)(3)(A). *Id.*

tion 524 describes the "[e]ffect of discharge" in a bankruptcy case:

> (a) A discharge in a case under this title—
>
> > (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 ... of this title, whether or not discharge of such debt is waived;
> >
> > (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

■ Section 727(b) provides that "except as provided in section 523 of this title, a discharge under [§ 727(a)] discharges the debtor from all debts that arose before the date of the order for relief under this chapter[.]" As this Court has stated: "Simply put, then, a chapter 7 discharge will prohibit the collection of all of a debtor's pre-bankruptcy debts, except those debts expressly excepted from discharge under § 523(a)." *In re Dickerson*, 510 B.R. 289, 296 (Bankr. D. Idaho 2014).

■ One limit on the reach of the discharge is found in § 523(a)(3)(A), which provides that a discharge is not effective as to a debt that is:

> neither listed nor scheduled under § 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—(A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing[.]

As noted, Davies' bankruptcy schedules did not list Becker as a creditor, and she relied on this exception to discharge in filing and asserting her counterclaim. *See* Ex. 108. However, there is a further exception to the general rule of § 523(a)(3)(A) in no-asset chapter 7 cases. *See Beezley v. California Land Title Co. (In re Beezley)*, 994 F.2d 1433 (9th Cir. 1993) (holding that, in no-asset chapter 7 cases, unscheduled pre-petition debts are nonetheless discharged); *see also, In re Venegas*, 257 B.R. 41, 46–47 (Bankr. D. Idaho 2001).

Here, Becker held a pre-petition claim. As stated in *Baroni v. Wells Fargo Bank, N.A. (In re Baroni)*, 558 B.R. 916 (Bankr. C.D. Cal. 2016):

> Whether a claim exists generally is determined as of the date of the filing of the bankruptcy petition, irrespective of whether the claim is contingent or unmatured at the time. *See* 11 U.S.C. § 502(b)(1); *In re SNTL Corp.*, 571 F.3d at 838: "[T]he Bankruptcy Code utilizes [the] 'broadest possible definition' of claim to ensure that 'all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case." *In re SNTL Corp.*, 571 F.3d 826, 838 (quoting *Cal. Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 929–30 (9th Cir. 1993)).

*Id.* at 922.[20]

Therefore, given *Beezley*, the discharge applies to Becker's claims that arose pre-petition and that she asserted in her state court counterclaim for breach of contract regarding her interest in the property, including the unpaid $1,055 of equity and reimbursement of her payments for taxes,

---

**20.** *SNTL Corp. v. Ctr. Ins. Co. (In re SNTL Corp.)*, 571 F.3d 826 (9th Cir. 2009).

insurance and improvements made prior to her moving out in October 2015.

### B. Sanctions

■ "A party who knowingly violates the discharge injunction [of § 524(a)(2) ] can be held in contempt under [§ ] 105(a) of the [B]ankruptcy [C]ode." *Zilog, Inc. v. Corning (In re Zilog, Inc.)*, 450 F.3d 996, 1007 (9th Cir. 2006). *See also Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1191 (9th Cir. 2003). "[T]o justify sanctions, the movant must prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction." *Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1069 (9th Cir. 2002) (*citing Hardy v. United States (In re Hardy)*, 97 F.3d 1384. 1390 (11th Cir. 1996)); *see also Nash v. Clark Cty. Dist. Attorney's Office (In re Nash)*, 464 B.R. 874, 880 (9th Cir. BAP 2012) (citing *Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1205 n.7 (9th Cir. 2008), *aff'd* 559 U.S. 260, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010)). The debtor must establish a discharge violation by clear and convincing evidence. *Id.* (citing *Espinosa* ); *Zilog*, 450 F.3d at 1007.

As noted, Becker was never listed as a creditor and never received notice from the Court about Davies' bankruptcy or the entry of Davis' discharge. Despite the lack of notice, Becker was likely aware in March 2016 that Davies had filed a bankruptcy case, as reflected in Ex. 115 emails, and was certainly aware as of December 2016 given the print-out of the Court's docket, Ex. 104. This awareness of the bankruptcy arose prior to the assertion of her February counterclaims in the State Court Action. However, Davies has not shown by clear and convincing evidence that Becker knew the discharge injunction applied to her claims.

■ The Ninth Circuit stated that, in order to impose sanctions for contempt under § 105(a), the movant must prove that the creditor (1) knew the discharge injunction was applicable, and (2) intended the actions which violated the injunction. *Zilog*, 450 F.3d at 1007; *see also Emmert v. Taggart (In re Taggart)*, 548 B.R. 275, 286 (9th Cir. BAP 2016). *Taggart* concluded:

> Taken together, *Bennett, Dyer*, and *Zilog* demonstrate that the Ninth Circuit has crafted a strict standard for the actual knowledge requirement in the context of contempt before a finding of willfulness can be made. This standard requires evidence showing the alleged contemnor was aware of the discharge injunction *and* aware that it applied to his or her claim. Whether a party is aware that the discharge injunction is applicable to his or her claim is a fact-based inquiry which *implicates a party's subjective belief, even an unreasonable one.*

*Id.* at 288 (second emphasis added); *see also Zilog*, 450 F.3d at 1009 n.14 (noting that "To be held in contempt, the [creditor] must not only have been aware of the discharge injunction, but must also have been aware that the injunction applied to [her] claims. To the extent that the deficient notices led the [creditor] to believe, even unreasonably, that the discharge injunction did not apply to [her] claims because they were not affected by the bankruptcy, this would preclude a finding of willfulness."). "This is consistent with the Ninth Circuit's reluctance 'to hold an unwitting creditor in contempt.' *In re 1601 W. Sunnyside Dr. # 106, LLC*, 2010 WL 5481080, at *4 (Bankr. D. Idaho Dec. 30, 2010)." *Taggart*, 548 B.R. at 288.

■ Here, Becker's counterclaim seeks liability for obligations that clearly arose prior to the November 30, 2015 petition

date and, thus, are prepetition claims, the collection of which is barred by the discharge injunction. The evidence establishes that Becker had knowledge of the bankruptcy filing before her counterclaim was filed. But, the evidence does not establish that Becker knew the discharge injunction applied to her claims.

Under the record presented, the Court does not find Becker had the subjective belief, prior to receipt of the July 21, 2017 letter, that the discharge was applicable to her claims. While mistaken, given the Ninth Circuit case law that developed in no-asset chapter 7 cases, that was nevertheless Becker's belief at the time she filed her counterclaim on or about February 22, 2017. It is the filing of the counterclaim that is challenged, and there is inadequate evidence of knowledge *and* subjective belief as of that date.

▇ After receipt of the July 21 letter, it is clear that Becker offered to amend her counterclaim to delete the prebankruptcy claim. It was Davies' broad assertion that the entirety of the counterclaim was violative of the discharge injunction and thus needed to be dismissed in its entirety—an overstated and incorrect proposition—that precluded Becker from remedying the problem as she had offered. Davies' insistence that Becker dismiss all of her counterclaim rather than agreeing

to allow it to be amended to eliminate her prepetition breach of contract claim—the only claim that implicated the discharge injunction—exemplifies Davies' litigious nature.[21]

The ultimate decision as to allowing amendment of the counterclaim and dismissal of certain causes of action therein, and as to how Idaho Rules of Civil Procedure 41(a) and (c), 13, and 15 should be applied would be the state district court's.[22] But the intransigence of Davies and his counsel to a simple solution eliminating the discharge violative claims and preserving the balance of the defenses and counterclaims exacerbated the problem and effectively prevented Becker from complying with this Court's discharge injunction once she was aware that it applied.[23]

## C. Davies can assert the contract ("loan") cause of action against Becker, and she may defend that claim without violating the discharge injunction

▇ The alleged $10,000.00 "loan" was disclosed in Davies' schedule B, and it constituted property of the estate under § 541(a)(1). The chapter 7 trustee did not administer this asset. Closure of the bankruptcy as a no-asset case in April 2016 effected an abandonment of the cause of action under § 554(c).[24] Davies was there-

21. The litigation conduct in this Court, and the evidence as to Davies' conduct toward Becker in the State Court Action, reflects an aggressive, if not abusive approach. It echoes what the Idaho Court of Appeals found in affirming $29,500 in attorneys' fees awarded Davies' ex-wife in different litigation. *See Davies*, 368 P.3d at 1020 (noting that "[David's] motions, and what I've heard about the discovery tactics, seems to me more trying to increase the burden on [Susan] in defending the lawsuit or prosecuting the lawsuit").

22. Such matters are committed to the trial court's discretion. *Trimble v. Engelking*, 130

Idaho 300, 939 P.2d 1379, 1382 (1997); *Hines v. Hines*, 129 Idaho 847, 934 P.2d 20, 26 (1997). The Court declines Davies' implicit suggestion that the Court address these procedural issues.

23. For completeness, the Court will note that Becker's counsel is not entirely without some fault in this regard. The record presented indicates that both counsel engaged in overly zealous litigation.

24. That section provides: "(c) Unless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not

fore free to assert this cause of action against Becker personally after his bankruptcy case closed.[25]

However, while discharge bars Becker's assertion of off-setting pre-November 30, 2015 claims, it does not impose any limitation whatsoever on Becker's *defense* of Davies' alleged "contract" action. A creditor, though barred by discharge from seeking affirmative relief on prepetition claims against the debtor, is entitled to defend claims asserted against it by a debtor to negate liability. This defense could also include affirmative defenses with the exception of any that are dependent on establishing and asserting affirmative *pre*bankruptcy claims against the plaintiff.

 Becker could therefore prepare and present her case that there was never a "loan" at all and that she owes nothing to Davies. In addition, her assertion of offset to any potential loan liability based on

*post*petition claims against Davies would not violate the discharge.[26]

A similar construct attends the emotional distress claims, so long as Becker seeks a recovery based on post-November 30, 2015 conduct of Davies. *Cf. O'Loghlin v. County of Orange*, 229 F.3d 871, 875 (9th Cir. 2000) (holding that a debtor who engages in postpetition illegal discriminatory conduct can be held liable for that conduct, even if claims for similar illegal discriminatory conduct occurring before the bankruptcy were discharged).

### D. Davies cannot assert pre-petition causes of action against Becker (other than the "loan") in the State Court Action.

 Davies seeks more than the contract damages for the $10,000 unpaid loan he allegedly provided Becker in December 2014. He also seeks $3,000 for a minivan she allegedly purchased from Davies in the

---

otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title."

**25.** Davies threatened to pursue that cause of action before his case was closed in April and the asset abandoned to him. *See* Ex. 115 (March 2016 email).

**26.** A successful defense might raise the potential of a claim for attorneys' fees in favor of Becker. This issue has been addressed by case law. "The purpose of the discharge injunction is to protect the debtor from having to put on a defense in an improvident state court action or otherwise suffer the costs, expense and burden of collection activity on discharged debts." *Taggart*, 548 B.R. at 286 (quoting *In re Eastlick*, 349 B.R. 216, 229 (Bankr. D. Idaho 2004)). But the situation changes when it is the debtor that initiates the post-bankruptcy litigation. "[E]ven if the underlying claim arose prepetition, the claim for fees incurred postpetition on account of that claim is deemed to have arisen postpetition if the debtor 'returned to the fray' postpetition by voluntarily and affirmatively acting to com-

mence or resume the litigation with the creditor." *Bechtold v. Gillespie (In re Gillespie)*, 516 B.R. 586, 591 (9th Cir. BAP 2014) (citing *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1026–27 (9th Cir. 2005)). This rule prevents a debtor from using the discharge injunction as a sword that enables him to undertake risk-free postpetition litigation at others' expense. *Id.* (citing *Ybarra*, 424 F.3d at 1026)). The rule applies regardless of whether the litigation begins prepetition or postpetition, the nature of the claim, or where the litigation takes place. *Id.* at 591–92 (citing *Ybarra*, 424 F.3d at 1023–24)). The key Ninth Circuit cases include *SNTL* and *Ybarra*, and also *Picerne Constr. Corp. v. Castellino Villas A.K.F. LLC, (In re Castellino Villas, A.K.F. LLC)*, 836 F.3d 1028 (9th Cir. 2016); *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir. 1998). *See also Baroni*, 558 B.R. at 922–25 (harmonizing these cases). As the Circuit has observed, "the debtor's decision to eschew the fresh start provided by bankruptcy and engage in new litigation is more akin to post-petition conduct that, by definition, was not in the fair contemplation of the parties prepetition." *Castellino Villas*, 836 F.3d at 1035–36.

summer of 2015; an engagement ring Becker allegedly sold to a pawn shop in October 2015; personal property allegedly taken or destroyed when Becker moved out of the residence in October 2015; the value of a BMW vehicle Becker allegedly forced Davies' son to transfer to Becker in October 2015; and Becker's share of accrued utility bills that she allegedly failed to pay when she moved out in October 2015. These claims are not Davies' to pursue.

Section 541(a)(1) provides that property of the bankruptcy estate includes "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case." Causes of action constitute property of the estate under § 541(a)(1) and are assets that must be formally listed. *In re JZ, LLC*, 357 B.R. 816, 823 (Bankr. D. Idaho 2006). Based on Davies' submissions in the State Court Action and this Court, it appears each of the above itemized causes of action against Becker arose prior to Davies' November 30, 2015 petition date.

■ Pre-petition claims become property of the estate regardless of whether they were scheduled, but unscheduled assets continue to belong to the estate and do not revert back to a debtor when the case closes. *Pretscher–Johnson v. Aurora Bank, FSB (In re Pretscher–Johnson)*, 2017 WL 2779977, *4 (9th Cir. BAP May 31, 2017) (citing *Cusano v. Klein*, 264 F.3d 936, 945–46 (9th Cir. 2001)). For abandonment under § 554(c) to occur, the assets had to be scheduled, and mentioning an asset in the statement of financial affairs or otherwise is insufficient. *Pretscher–Johnson*, 2017 WL 2779977 at *4–5 (holding that "scheduled" in § 554(c) has a specific meaning). *See also In re Davis*, 2002 WL 33939739, *5 (Bankr. D. Idaho February 14, 2002) (holding that unscheduled

assets were not abandoned at closing and continue to belong to the bankruptcy estate).

Here, Davies did not schedule these several alleged claims against Becker. Because Davies' chapter 7 trustee neither administered nor abandoned the claims, they remain property of the estate. *Lopez v. Specialty Rests. Corp. (In re Lopez)*, 283 B.R. 22, 28 (9th Cir. BAP 2002). The chapter 7 trustee has exclusive standing to prosecute them. *Davis*, 2002 WL 33939739 at *6. *See generally Estate of Spirtos v. One San Bernardino Cty Superior Court Case Numbered SPR 02211*, 443 F.3d 1172, 1175–76 (9th Cir. 2006) (concluding that the Bankruptcy Code endows the trustee with the exclusive right to sue on behalf of the estate).

■ A debtor not only lacks standing, but may be judicially estopped from asserting claims that should have been but were not scheduled in his bankruptcy. *Davis*, 2002 WL 33939739 at *6; *see also McCallister v. Dixon*, 154 Idaho 891, 303 P.3d 578 (2013); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). As *Hamilton* stated, a debtor "is precluded from pursuing claims about which he had knowledge, but did not disclose, during his bankruptcy proceedings," *Id.* at 784.

Therefore, the causes of action not listed in Davies' schedules are property of the bankruptcy estate, and Davies has no standing to pursue those claims against Becker in the State Court Action.

## E. Reappointment of a chapter 7 trustee

■ This case was reopened by Davies in order to pursue his Motion.[27] The Court

---

**27.** Davies' motion to reopen was filed by his present counsel, not his former bankruptcy attorney. New counsel, in representing Davies

did not then require the appointment of a trustee. *See* Rule 5010. However, based on the record now before the Court, it will *sua sponte* order under Rule 5010 that the United States Trustee appoint a chapter 7 trustee in the reopened case. That trustee can then determine whether to pursue, dismiss or settle those alleged claims. In addition, in Becker's objection to the Motion, she alleged Davies possessed a number of valuables and items of personal property one month before he filed bankruptcy, and he did not disclose them in his schedules. *See* Doc. No. 50 at 7–8. A trustee can also investigate these assertions along with any other relevant matters.[28]

## CONCLUSION

Upon the foregoing, having evaluated the entirety of the evidence, including consideration of the credibility of witnesses and the weight to be given the testimony, the Court will deny the Motion. An appropriate Order shall be entered.

Additionally, the Court shall enter an Order instructing the United States Trustee to appoint a chapter 7 trustee to investigate and administer any undisclosed assets of the estate in this reopened case.

as debtor in this case, is required to comply with Rule 2016(b), and has failed to do so.

**28.** Nothing in this Decision is intended to restrict or to direct the exercise of the trustee's discretion in administering the estate.